**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TARA CABLE,

      Plaintiff,

vs.                                                     **COMPLAINT**

VILLAGE OF SUFFERN, CLARKE OSBORN,
ANDREW LOUGHLIN,

      Defendants.
------------------------------------------------------------x

By and through her counsel, Michael H. Sussman, Esq., plaintiff Tara Cable hereby complains of defendants as follows:

Defendant Village of Suffern, acting through its policy makers, has adopted a municipal practice of treating female police officers in a manner inferior to its treatment of male officers.  The instant suit challenges that practice on behalf of one of the female officers victimized by it.

I. **PARTIES**

1.  Plaintiff Tara Cable is a female of legal age who resides within this judicial district.

2.  Defendant Village of Suffern [hereinafter "the village" or "Suffern"] is a municipal corporation which funds and operates a police department. Defendant village has deferred management of the police department to a police chief who acts as final policy-maker with regard to the management of the department's personnel, including the provision of proper training, the supervision of police officers and the imposition of discipline against its personnel, including police officers.

1

3.  Defendant Clarke Osborne served as Police Chief of the defendant department until the early fall 2020 when defendant Andrew Loughlin, who had served as a lieutenant in the department, was promoted by the Village Board to the position of Police Chief.

## II.  **JURISDICTION**

4.  As plaintiff alleges that the defendants intentionally violated her rights to equal protection under the law because of her gender, this Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. secs. 1331, 1343 (3) & (4) and 42 U.S.C. secs. 1983 and 1988.

## III.  **STATEMENT OF FACTS**

5.  Defendant Village appointed plaintiff as a part-time police officer in the summer 2018.  At the time of her appointment, Clarke Osborn served as Police Chief.

6.  The Police Chief's son, William Osborn, then worked as a full-time, probationary police officer for the Village of Suffern.

7.  During the first two years of plaintiff's employment, William Osborn engaged in an ongoing course of sexually harassing behavior, sending her inappropriate photos, touching her repeatedly in an unwanted manner, and presenting himself in public situations as plaintiff's personal partner.

8.  Though plaintiff made clear her lack of interest in having a personal relationship with him, William Osborn persisted in pursuing her and making her uncomfortable at the workplace.

2

9. In June 2020, plaintiff told Lt. John Mallon that William Osborn's had sent her inappropriate photos and that she was uncomfortable with his constant flirty, clingy behavior and unwanted touching.

10. Defendants did not discipline William Osborn for his course of sexual harassment of plaintiff, failed to conduct a good faith investigation to confirm that he engaged in relentless sexual harassment of plaintiff and placed nothing in his personnel file about behavior, including the sending of explicit photos to plaintiff or otherwise sexually harassing her.

11. In the early fall 2020 defendant Village promoted plaintiff to the position of full-time police officer.

12. This promotion followed plaintiff's revealing that William Osborn had sent her illicit photos without her consent.

13. By the time of this promotion, plaintiff had not been advised that the defendant maintained a file showing numerous alleged instances of improper conduct and poor performance by her.

14. Indeed, the history revealed in plaintiff's later revealed personnel file is incompatible with defendant's promoting plaintiff to the position of full-time police officer and shows that defendant gave plaintiff this promotion to silence her complaints about the sexual harassment engaged in by defendant Osborn's son.

15. Following her promotion, plaintiff was required to serve a probationary period as a full-time police officer.

3

16.  On or about February 7, 2021, plaintiff received an employee appraisal which found her performance as a police officer satisfactory but noted that she had primarily worked as a part-time officer and needed more exposure to the job and the diversity of call types and assignments associated with the job.

17.  Through the months of February-April 2021, plaintiff's supervising Sgt., Giannettino, repeatedly counseled plaintiff, particularly criticizing her for not writing enough UTTs.

18.  However, neither this sergeant nor other supervise likewise chastised and wrote up male officers with similar ticket-writing records.

19.  On April 12, 2021, Lt. Martinez and defendant Loughlin met with plaintiff to discuss her performance and advised her that she needed to show consistent productivity throughout the month.

20.  This meeting was highly irregular as plaintiff's productivity was comparable to that of male officers who were not brought to the chief's office for such meetings.

21.  At the same meeting, defendant Loughlin denied plaintiff's request to attend specific training and told her she needed to first gain more experience by conducting DWI enforcement and assisting other officers when a DWI arrest is made.

22.  Defendant Loughlin and Lt. Martinez told plaintiff that she could not wait for the department to send her to training but needed to research materials on her own to assist her in becoming a well-rounded police officer.

23.  These department leaders did not provide similar directives to male officers like Dunn, Roberts, DeLuca, Figueroa, Ortiz, York, Gulla and Kiernan, when they were completing their probationary periods and had like levels of activity.

24.  At the same meeting, the Chief and Lt. told plaintiff that if her performance did not improve and meet the standards set by the police department, then a future with the agency would not be possible.

25.  At the time, the defendant had not advised plaintiff or other probationary officers of its standards and the threats she received were unusual and not provided to male probationary officers with similar records of productivity and service time.

26.  In mid-June 2021, on behalf of the Village, defendant Loughlin continued applying disparate standards to plaintiff, claiming that her number of traffic stops and UTTS issued was below expected levels.

27.  By the time defendant Loughlin so evaluated plaintiff, neither he nor his predecessor, defendant Osborn, had promulgated any directive with the expected performance levels for police officers.

28.   Following provision of plaintiff's mid-June 2021 performance appraisal, defendant Loughlin continued to micro-manage her performance and productivity.

29.   On July 11, 2021, at the instance of defendant Loughlin, Sgt. David Figueroa told plaintiff that he would be monitoring her level of activity to see if there was any improvement and that continued lack of activity would lead to disciplinary action.

30.   Such repeated threats on her job were unusual and not made to male officers with similar levels of productivity as identified in paragraph 23 above.

31.   Such repetitive threats to her job caused plaintiff emotional distress as she knew that there no were generally applied standards of performance against which she was being judged and that the fabrication of such standards was evidence of gender bias suffered by other former female police officers who had by then left the department.

32.   On July 12, 2021, plaintiff pursued a vehicle which fit the description of one in which a person suspected of involvement in a shooting in Mahwah had fled.

33. Plaintiff pursued this vehicle out of the police department's jurisdiction and succeeded in stopping the vehicle.

34.  Within thirty seconds of this stop, police officers from Ramapo, the jurisdiction in which the vehicle had entered, arrived and questioned the driver who they ultimately determined was not involved in the Mahwah shooting.

35.  Plaintiff behaved in an appropriate manner when she so deferred to the arriving officers as the suspect was within their jurisdiction.

36.  Rather than recognize that plaintiff had properly performed her job, her supervisor wrote up a three-page review which chastised her for failing to get out of her vehicle once she had stopped the suspect and local police officers began apprehending him.

37.  In so proceeding, plaintiff did not depart from training, custom or practice and it was defendant Loughlin who deviated from standard practice by investigating a matter of this sort.

38.  This departmental review and the conclusion that plaintiff violated numerous general orders can be contrasted with the treatment the same department accorded probationary officer William Osborn.

39.  On November 18, 2019, he investigated a motor vehicle accident after which the driver was arrested for V & T infractions.

40.  The driver's vehicle was impounded; before impoundment, the responding officer, here Osborn, was required to prepare an inventory voucher but did not do so.

41.  The following day, the impound shop contacted the police agency and advised that there was a significant sum of cash in the center console of the impounded vehicle.

42.  Suffern police officers then attended to the vehicle and conducted a proper inventory, finding an AK-47 with a collapsible stock and a pistol grip under the backseat and a loaded magazine which fit this weapon in the glovebox.

43.  William Osborn neglected his duties by failing to perform a proper inventory, but, again, nothing was placed in his file reflecting this event and there was no departmental investigation of the event.

44.  On July 19, 2021, plaintiff was scheduled to commence a three-week trial period with defendant's detective bureau.

45.  Upset over the continued harassment and micro-management she faced as a police officer, plaintiff overslept, called the police desk when she awoke and advised dispatch that she would take two hours of her accrued time back hours and report to the station by 10 am.

46.  Upon her arrival for service, defendant Loughlin invited plaintiff to his office and, with Lt. Martinez, his subordinate, aggressively questioned her about the July 12 incident.

47.  Plaintiff explained her actions and the reason she deferred to Ramapo police officers in whose jurisdiction she stopped the fleeing suspect.

48.   Defendant Loughlin and Lt. Martinez continued to insinuate that the incident showed that plaintiff was not capable of doing police work and was afraid of confronting the suspect.

49.   In so characterizing plaintiff, defendant Loughlin engaged in gender stereotyping, claiming that, as a female officer, plaintiff was fearful of confronting the fleeing male suspect.

50.   At the same meeting, defendant Loughlin advised plaintiff that he intended to terminate her if she did not resign and raised a raft of other personnel issues which had never before been mentioned to plaintiff and most all of which arose before she was promoted to the position of full-time police officer.

51.   On July 21, 2021, convinced that she would continue to be subjected to disparate standards when compared with male officers and treated in a hostile and inferior manner, plaintiff tendered her resignation as a police officer.

52.   This resignation was coerced, not voluntary, and plaintiff so proceeded to save her certification as a police officer in the State of New York.

53. Defendant Loughlin's treatment of plaintiff following her late arrival differed from its treatment of a male officer who did not report for a shift on September 1, 2021, did not call in and was not disciplined in any manner, let alone directed to resign or face termination, as plaintiff was.

54.  Defendant Loughlin's treatment of plaintiff also differed from his treatment of police officer Joseph Ingui who completed his field training on or about May 30, 2021 and remained on probation at all material times.

55.  On June 13, 2021, PO Ingui called out sick for his midnight shift.

56.  The same day, Sgt. Daniel Kiernan called out sick for the same shift, causing double overtime for patrol.

57.  Superiors proceeded to initiate house checks for Ingui and Kiernan since officers who call out sick are required to be at home during the shifts they are assigned to and are missing.

58.  PO Ingui was not at his home when Lt. Martinez did this house check.

59.  A few days later, defendant Loughlin met with Ingui and took five vacation days from him as sanction.

60.  Defendant Loughlin did not make Ingui resign as a consequence of the violation of departmental rules and, instead, within three months, awarded him the post of K-9 officer

61.  On the contrary, on July 19, 2021, the day plaintiff overslept, called in and reported to work, she was brought into defendant Loughlin's office and given an ultimatum of resigning or being fired.

62.  Defendant Loughlin's course of treatment was motivated in large measure by plaintiff's gender.

63.  Defendant Loughlin's course of treatment caused plaintiff substantial humiliation, emotional anguish, depression and anger.

IV.  **CAUSES OF ACTION**

64.  Plaintiff incorporates paras. 1-63 as if fully incorporated herein.

65.  By permitting his son to engage in a pattern of unwanted sexual harassment against plaintiff, defendant Osborn intentionally violated plaintiff's right to a work place free from hostility to her on the basis of her gender and so violated the Fourteenth Amendment to the United States Constitution.

65.  By applying different standards to her performance than those applied to similarly-situated male police officers, defendant Loughlin intentionally discriminated against plaintiff on the basis of her gender in violation of her right to equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

66.  The actions of both defendant chiefs are fairly attributed to the Village of Suffern which delegated policy-making regarding police personnel to both chiefs of police.  Accordingly, defendant Village of Suffern discriminated against plaintiff on the basis of her gender in violation of her right to equal projection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

## V. **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that this Honorable court accept jurisdiction over this matter, empanel a jury to hear and decide the matters set forth herein, award to plaintiff compensatory damages for defendants' violation of her constitutional rights, award punitive damages against defendants Osborn and Loughlin for their wanton toleration of, and engagement in, gender-based discrimination, award her the reasonable attorneys' fees and costs incurred in the prosecution of this manner and enter any other order required by law or equity.

Dated:  October 25, 2021

Respectfully submitted,

Michael H. Sussman [3497]

Counsel for Plaintiff
SUSSMAN & ASSOCIATES
PO BOX 1005
GOSHEN, NY 10924
(845)-294-3991
Sussman1@sussman.law